Filed 5/13/22  P. v. Spicer CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>       v.<br><br>JESSE SPICER, et al.,<br><br>       Defendants and Appellants. | B308931<br><br>(Los Angeles County<br>Super. Ct. No. TA148753) |

APPEALS from judgments of the Superior Court of Los Angeles County, John J. Lonergan, Judge.  Remanded with directions.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant Jesse Spicer.

Joanna Rehm, under appointment by the Court of Appeal, for Defendant and Appellant Akkeli Frederick.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, Paul M. Roadarmel, Jr., and Michael Katz, Deputy Attorneys General, for Plaintiff and Respondent.

––––––––––––––––

Jesse Spicer and Akkeli Frederick were jointly tried by one jury and found guilty of gang-related murder and attempted murder. While in jail, Spicer made incriminating statements to a confidential informant masquerading as a fellow inmate, including ones identifying Frederick as his accomplice. On appeal, both defendants contend that Spicer's statements should have been excluded. They also contend that there is insufficient evidence to support the judgments, that certain identification evidence and evidence Spicer was on probation were improperly admitted, and the trial court should have imposed a discovery sanction on the prosecution. We reject these contentions but because Spicer and Frederick are entitled to the benefit of recently-enacted ameliorative laws, remand is necessary.

## BACKGROUND

I.  March 27, 2019:  the murder of Denzel Gordon and the attempted murder of Donald Neal

Brothers Isaiah Gordon and Denzel Gordon[1] lived at the Jordan Downs apartments in Watts. Both were members of the Grape Street Crips, and Denzel was known as Poppy.[2] The Grape Street Crips dominated the area around Jordan Downs.

––––––––––––––––

[1] We use first names for members of the Gordon family for clarity.
[2] Although Isaiah denied being a gang member, the People's expert testified that he, as well as family members, were Grape Street Crips.

2

Its rival, Bounty Hunter Bloods, claimed the area around Nickerson Gardens, also in Watts.

On March 27, 2019, sometime before 7:23 p.m.,[3] Isaiah and Denzel were on Grape Street and 101st Street where their aunt lived. Isaiah had driven there in his Camaro, which Denzel wanted to test drive. When Denzel returned after driving the car for a bit, he turned it off. The car wouldn't restart, so Denzel went to get jumper cables. Meanwhile, Isaiah was getting something from the car when four gunshots were fired. Denzel was shot in the stomach and died later that night.

Not long after Denzel was shot and about two miles away, Donald Neal and his friend Dante Myers were in the area of 104th and Broadway at about 7:50 p.m. While sitting in Neal's parked Camaro, Neal heard a gunshot. Unsure of where the shot came from, he drove away but lost control of the car and crashed into a gate. The car had a bullet hole in its rear.[4]

When the police arrived, they found parked nearby the car used in both shootings, a red Nissan Rogue that had been reported stolen one week before. A backpack containing items with Spicer's name on them, including his school identification card, were in the car.

II. Isaiah's and Quennisha Gordon's statements

Just hours after Denzel died, in the early morning of March 28, 2019, Isaiah told Detective Peter McCoy what happened: a burgundy truck pulled up, "they" said "Bounty Hunters," and they shot Denzel. Although Isaiah said he didn't recognize

---

[3] This is when officers received a report of the shooting.
[4] At trial, Neal was unsure whether the damage was from this shooting or an earlier shooting incident he had been involved in.

anyone in the truck, the passenger/shooter "kind of looked like this boy named Jesse" from Nickerson Gardens. Isaiah couldn't really see the shooter's face because he "low-key, covered up his face with his other arm." The shooter wore a black hoodie and was hanging out of the window.

A few days after this initial interview, the detective again spoke to Isaiah, who said he "really couldn't see his [the shooter's] face, so that's why I'm not fittin' to just say I seen him, but" he did catch a glimpse of his face. The shooter was Black, and Isaiah could see a little hair on top. Isaiah now thought it was the driver who had said, "Bounty Hunters," and Isaiah had heard rumors that the driver's name was Flaca or something like that. He could not tell if there were more than two people in the car.

Isaiah told the detective that he knew the shooter's name was "Jesse" because "some girl" told him, and Isaiah recognized Jesse from Instagram. According to Isaiah, Jesse used to date a girl named Raja[5] from the projects, and she and Jesse would post videos that Isaiah had seen. Isaiah also said he told a friend[6] he knew it was Jesse, and his friend found Jesse's picture on Instagram, which he showed to Isaiah. From a photographic six-pack, Isaiah identified Spicer as the man he saw hanging out of the car, saying he recognized the side of his face.[7]

Denzel and Isaiah's sister, Quennisha, testified that, after the shooting, Isaiah told her he had seen the shooter. She showed Isaiah an Instagram profile page, and Isaiah said that

---

[5] Raja is spelled different ways in the record.
[6] Isaiah refused to identify his friend by his full name.
[7] At trial, Isaiah denied recalling any details about the shooting and identifying Spicer.

the man in it was the shooter.[8]  Quennisha showed the photograph, which was of Spicer, to the detective.

III.  Surveillance, firearm, and print evidence

Video surveillance from the Jordan Downs complex captured some of the events.  The video shows a red or burgundy vehicle slow with its passenger, wearing a black sweatshirt, hanging out of the window when Denzel was shot.  The vehicle then turned onto another street with the passenger still hanging out of the window.

Cartridge casings recovered from the Gordon and Neal crime scenes were fired from the same gun, likely a Glock-type firearm.

Forty-two latent prints were found on the Nissan Rogue, and a criminalist matched 33 of them to ten people.  Eight prints were Spicer's, including one from the outside driver's side front door, two from the inside driver's side doorjamb, one from the outside passenger side rear window, and another from the outside passenger side front door handle.  Frederick's thumb print was on the inside passenger side rear door window, and his palm print was on the hood.[9]  There is no way to tell when any prints were left on the car.

Around the times Denzel was murdered and Neal was shot at, cell phones linked to Spicer and to Frederick were in the general area of the crime scenes.

---

[8] Quennisha was vague about how she obtained the Instagram profile page, saying someone showed it to her, and Quennisha photographed it.

[9] Prints belonging to Twyman Samocki, Spicer's cousin, were in the car.

## IV. Social media evidence

Evidence relating to an Instagram account linked to Spicer was introduced at trial. The account's user name was bmbgbhrazy, and the account was registered to email address jessespicer01@icloud.com and to a phone number ending in 8879. In recorded jail calls, Spicer confirmed that was his email address, his phone number, and his user name for his Instagram account.

The day after Denzel was murdered, 1daprxncess messaged the Instagram account, asking, "why do you hope im pregnant," and the response from the account was, "BC idk what can happen to me so I want [a] part of me to be in this world if I leave." The account messaged Hoddiebhoy_Flocka: "Red want you." "Rajaah" also messaged the account, saying "Babe." On March 28, 2019, a message was sent to the account, "I hope you ain't doin' no dumb shit." Another message sent to the account after Denzel was murdered said, "He died foo," and bmbgbhrazy said, "Fuck Poppy Bitch."

When Spicer was arrested on April 23, 2019, he had a new cell phone with a number different than the one associated with the Instagram account. The number associated with the Instagram account was terminated the day Denzel was shot.

## V. The Perkins[10] operation

After he was arrested, Spicer was placed in a jail cell with a confidential informant[11] pursuant to a Perkins operation. As explained to the jury, a Perkins operation is when an arrestee and a confidential informant are placed in a cell in the hopes that

---

[10] *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*).
[11] The agent was not a member of law enforcement and was paid.

conversation between them will elicit facts relevant to the investigation.  Here, the Perkins operation was audio and video recorded, and while it was happening, Detective McCoy was surreptitiously watching through video monitors.  Spicer had not been given *Miranda*[12] advisements.

The confidential informant began by asking where Spicer was from, and Spicer answered, "Bounty Hunters."  Soon thereafter, Detective McCoy went to the cell and told Spicer he was there because "Poppy got killed."  The detective left, saying he would return.

The confidential informant proceeded to observe, "It ain't no probation violation."  Spicer said they had no evidence, but he was about "to get violated," agreeing with the confidential informant that it was a "hot one," which refers to murder.  Spicer added they had nothing on him.

The detective returned to the cell and told Spicer that they had the car and his backpack.  The detective left, and the confidential informant asked if the car was the one used in the "get down."  Spicer replied, "Uh-huh."  The confidential informant asked if "the shit went down" in the day or night, and Spicer said, "It was day time."  When the confidential informant asked why Spicer left his backpack in the car, Spicer said he had told the detective he lost it and now "I just gotta stick to my same story."  The confidential informant wondered if there was a camera showing how many people were in the car and asked who was with Spicer in the car.  Spicer did not answer directly but referred to "my cousin, my blood cousin."  When asked what happened to the gun, Spicer said he got rid of it and that it was a Glock.

---

[12] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

The confidential informant told Spicer that because it happened in daytime, somebody probably "seen you do your shit." He told Spicer there was a difference between being inside the car or hanging out the window, so "[y]ou better think. Was your head all out the window?" Apparently in response, the video showed Spicer put on his hoodie.

Under the guise of going to an interview, the confidential informant was removed from the cell so that Detective McCoy could tell him to drop the name of Spicer's cousin, Twyman Samocki, whose nickname was Mock. On returning to the cell, the confidential informant told Spicer that law enforcement had Mock in custody. Spicer said Mock was his cousin, but that Mock didn't know anything about what happened because Mock wasn't there. The confidential informant said that the police were asking for names, and Mock was saying names, but "I don't know what your cousin name that went with you." Spicer responded, "Red" and "Akkeli," his first cousin.

VI.    Jail calls

While in jail, Spicer called Raja and said, "They tryin to make it seem like that, like, I told on my crimey." Crimey can refer to a codefendant.

VII.   Gang evidence

The People's gang expert testified that the Bounty Hunter gang has about four hundred to five hundred members, and its primary activities include narcotic sales and trafficking, robbery, burglaries, weapons and ammunition possession, grand theft auto, assault with deadly weapons, attempted murder, and murder. The Bounty Hunter gang expects its members, especially younger ones, to put in work, i.e., commit crimes.

8

Respect is important to gangs, and the most common way to earn it is to promote and further the gang's criminal activity. Committing crimes also instills fear in the community, making the public unwilling to assist the police.

The feud between the Bounty Hunter gang and its main rival, the Grape Street Crips, is a violent one. If Bounty Hunter gang members go into Grape Street Crips's territory, they are looking to put in work. Denzel was shot in Grape Street Crips's territory, but Neal was shot at in Broadway Gangster Crips's territory, and that gang has a neutral relationship with the Bounty Hunter gang.

The gang expert had several contacts with Spicer, who was, in the expert's opinion, a Bounty Hunter gang member. About one week before Denzel was killed, Spicer told a patrol officer during a stop that he was a Bounty Hunter gang member. After Denzel's murder, Spicer got a gang tattoo, an ape, signifying dominance and fear and that he was evolving as a gang member. Typically, such tattoos need to be earned. BHRAZY is one of Spicer's monikers, and BH stands for Bounty Hunter.

In the expert's opinion, Frederick was also an active member of the Bounty Hunter gang, and his monikers were Red and Young God.

To evidence the predicate crimes, the People introduced evidence that Desean Taylor, a Bounty Hunter, was convicted in 2018 of robbery, and he was a member of the gang during the robbery investigation and conviction. Donald Ray Byrd was convicted of assault with a firearm, which occurred in December 2017. He was a member of the Bounty Hunter gang during the investigation of that crime.

9

When presented with hypotheticals modeled on the facts of this case, the expert opined that such crimes would be committed in association with and for the benefit of the gang. The violent acts benefit the gang because they instilled fear in the community, promoted the gang, and committing the two crimes in such a short span of time enhanced the gang's reputation for violence.

VIII. Verdicts and sentences

A jury found Spicer and Frederick guilty of the first degree murder of Denzel (Pen. Code,[13] § 187, subd. (a); count 1); the willful, deliberate and premeditated attempted murder of Isaiah (§§ 664, 187, subd. (a); count 2); and shooting from a motor vehicle at Denzel and Isaiah (§ 26100, subd. (c); count 5).[14] As to Spicer, the jury found true personal gun use allegations under section 12022.53, subdivisions (b), (c), and (d), as to counts 1 and 5 and under subdivisions (b) and (c), as to count 2. As to Frederick, the jury found true principal gun use allegations under section 12022.53, subdivisions (b), (c), (d) and (e)(1), as to counts 1 and 5 and under subdivisions (b), (c) and (e)(1), as to count 2. As to all counts and both defendants, the jury found true gang allegations (§ 186.22, subd. (b)(1)(C)).

Spicer was originally sentenced in November 2020, but then, pursuant to a motion for resentencing, was resentenced on February 17, 2021 to 25 years to life on count 1 and to 15 years to life on count 2. The trial court imposed and stayed sentences for

---

[13] All further undesignated statutory references are to the Penal Code.

[14] The jury acquitted Spicer of counts 3 and 4 for the attempted murders of Neal and Myers and of count 6 for shooting at an occupied vehicle.

the gun and gang enhancements on each count.  On count 5, the trial court imposed the upper term plus a term for the gang enhancement and stayed the sentence.

Frederick was also originally sentenced in November 2020, but was resentenced on April 20, 2021 to 32 years to life composed of 25 years to life on count 1 and the high term of seven years to life on count 2.  The trial court imposed but stayed sentences on the remaining allegations and stayed an upper term sentence on count 5.

## DISCUSSION

I.    Admission of Spicer's jailhouse statement

Both defense counsel moved to exclude Spicer's jailhouse statements to the confidential informant, arguing that he made the statements to a proxy for the police and therefore his Fifth and Sixth Amendment and *Miranda* rights were violated.  The trial court overruled the objections, and specifically found that Spicer's statements were not testimonial and his *Miranda* rights were not violated, under *Perkins*, *supra*, 496 U.S. 292.  Both Spicer and Frederick now contend that Spicer's statements should have been excluded.

A. *Spicer*[15]

The Fifth Amendment privilege against self-incrimination prohibits admitting a suspect's statements made during a custodial interrogation in the absence of advisement of *Miranda* rights and the suspect's knowing and intelligent waiver of them.

---

[15] Frederick joins Spicer's arguments.  We need not decide the propriety of the joinder as to each argument because we find that Spicer's statements were properly admitted.

11

(*People v. Leon* (2020) 8 Cal.5th 831, 842–843.) *Miranda* advisements were designed to preserve the privilege during a police-dominated atmosphere, which can work to undermine a person's will to resist and compel the person to speak when the person would not otherwise do so freely. (*Perkins*, *supra*, 496 U.S. at p. 296.)

However, conversations "between suspects and undercover agents do not implicate the concerns underlying *Miranda*." (*Perkins*, *supra*, 496 U.S. at p. 296.) When a suspect speaks freely to someone the suspect believes is merely a fellow inmate, the coercive atmosphere is absent. (*Ibid.*) *Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in someone the suspect supposes is a fellow prisoner. (*Perkins*, at p. 297.) "Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." (*Ibid.*) *Miranda* does not protect suspects from boasting about their criminal activities to persons whom they believe are cellmates. (*Perkins*, at pp. 297–298.)

Spicer acknowledges *Miranda*'s limited applicability to his conversation with a confidential informant. He therefore suggests that we follow Justice Thurgood Marshall's dissent in *Perkins*, *supra*, 496 U.S. at pages 303 to 309, as Justice Marshall found that the defendant's statements should have been excluded. But, as Spicer also acknowledges, we are not at liberty to do so. (See generally *Auto Equity Sales, Inc. v. Superior Court* (1956) 57 Cal.2d 450, 455.)

Spicer alternatively argues that the "general rule" in *Perkins* should not apply because of the nature of the confidential informant's questions, Spicer's age (18 years), and the custodial

setting.  In essence, Spicer's argument is his statements were involuntary.  On this issue, the question is whether his statement was the " 'product of an " 'essentially free and unconstrained choice' " or whether the defendant's " 'will has been overborne and his capacity for self-determination critically impaired' " by coercion.' " (*People v. Flores* (2020) 9 Cal.5th 371, 426.)  We consider the totality of the circumstances to determine whether the prosecution met its burden of establishing by a preponderance of the evidence that defendant's confession was voluntary, with no single circumstance being dispositive.  (*Ibid.*)  Circumstances to consider include any police coercion, the interrogation's length, location, and continuity, and the defendant's maturity, education, and overall health.  (*People v. Suarez* (2020) 10 Cal.5th 116, 157.)  A confession is essentially not free when a suspect's confinement was physically oppressive, or the suspect's mental state was visibly compromised.  (*People v. Spencer* (2018) 5 Cal.5th 642, 672.)  A confession also may be involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence.  (*People v. Benson* (1990) 52 Cal.3d 754, 778.)

Spicer argues that his statements were coerced because the conversation was not "free flowing."  The informant posed questions to him, asking, for example, whether it was possible a camera captured the shooting or there were witnesses, whether the shooting happened during the day or night, whether Spicer was hanging out of the car window, what happened to the gun, and who else was in the car with him.  However, Spicer cites no authority to show these questions were inappropriate, especially given *Perkins*.  To the contrary, in *People v. Fayed* (2020) 9 Cal.5th 147, 157, the defendant made incriminating statements

13

to his cellmate, who, unbeknownst to the defendant, was an informant for law enforcement. Even though the informant asked leading questions, ingratiated himself to the defendant by expressing sympathy for his actions, and was much more than a passive listener, the court did not find that such tactics were likely to procure an untrue statement, improper, or coercive. (*Id.* at p. 166.)

Similarly here, even if the informant was not a passive listener, he did not threaten or intimidate Spicer or make improper promises, and the circumstances of Spicer's confinement were not oppressive. At all times, the informant acted as a friendly confidante or as an older figure familiar with gang and prison life, which did not create a coercive environment. (See, e.g., *People v. Rodriguez* (2019) 40 Cal.App.5th 194, 198–199 [rejecting contention that defendant was coerced because informant posed as an older, well-connected gang member]; *People v. Linton* (2013) 56 Cal.4th 1146, 1178 [questioners did not use aggressive, hostile, or threatening tone; interrogation not coercive].)

Further, while Spicer was young, just 18 years old, he was nonetheless legally an adult, and the record gives no reason to suspect he suffered from any physical or mental disability, or that his mental acuity was lacking. To the contrary, Spicer had some familiarity with the juvenile criminal justice system, and things he said during the Perkins operation showed some level of sophistication. For example, Spicer said he would stick to his story regarding how his backpack ended up in the car and he understood the limits of what the police knew. We therefore do not agree that Spicer's youth alone is enough to show that his will was overcome.

14

B. *Frederick*

Focusing on that part of Spicer's statement identifying him, Frederick argues that the statement was hearsay without exception.[16]  We disagree.

### 1.  Declarations against penal interest

The general hearsay rule is that evidence of a statement made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated is inadmissible.  (Evid. Code, § 1200, subds. (a), (b).)  An exception is for a statement against the declarant's penal interests.  (*Id.*, § 1230; see generally *People v. Chhoun* (2021) 11 Cal.5th 1, 42–43.)  The rationale underlying this declaration-against-penal-interest exception is that persons who implicate themselves criminally give reasonable assurance of the veracity of their statements.  (*People v. Grimes* (2016) 1 Cal.5th 698, 711 (*Grimes*).)  For the exception to apply, the declarant must be unavailable, the declaration must be against the declarant's penal interest when made, and the declaration must be sufficiently reliable to warrant admission.  (*Ibid.*)  To determine the statement's trustworthiness, the court may consider the circumstances in which it was made, the declarant's possible motive, and the declarant's relationship to the defendant.  (*Ibid.*)

We review a trial court's ruling under Evidence Code section 1230 for abuse of discretion.  (*Grimes*, *supra*, 1 Cal.5th at pp. 711–712.)

---

[16] The People argue that Frederick did not object to the statement on this ground.  Even if he did not, we would address the issue as it affects his substantial rights.  (§ 1259.)

Frederick argues that Spicer's statement incriminating Frederick was not against Spicer's penal interest because when Spicer made the statement, Spicer had already incriminated himself as the shooter. Therefore, naming Frederick did not expose Spicer to any additional or more serious charge or punishment than Spicer already faced. In making this assertion, Spicer relies on the rule established in *People v. Leach* (1975) 15 Cal.3d 419, 441, that Evidence Code section 1230 does not permit the admission of any statement or part of a statement that does not specifically disserve the declarant's interests.

Our Supreme Court in *Grimes*, *supra*, 1 Cal.5th at pages 713 to 714, clarified the *Leach* rule, noting it usually applies so as to exclude statements made when a declarant inculpates others *to shift the blame or to curry favor*. (See also *Williamson v. United States* (1994) 512 U.S. 594, 600 [exception does not authorize admitting portion of third party's out-of-court confession tending to shift blame to defendant].) The *Leach* rule cannot be applied by rote but instead requires a contextual approach. *Grimes*, at page 715, thus observed it had applied the *Leach* rule to bar admission of a third party's self-serving confession that shifted responsibility to others but had also applied it to allow admission of "portions of a confession that, though not independently disserving of the declarant's penal interests, also are not merely 'self-serving,' but 'inextricably tied to and part of a specific statement against penal interest.' " (*Grimes*, at p. 715.) In sum, the exception's nature and purpose "does not require courts to sever and excise any and all portions of an otherwise inculpatory statement that do not 'further incriminate' the declarant. Ultimately, courts must consider each statement in context" to answer whether the statement, even if

not independently inculpatory of the declarant, is nevertheless against the declarant's interest such that a reasonable person in the declarant's position would not have said it unless true. (*Grimes*, at p. 716.)

Applying this contextual approach here, Spicer's statement identifying Frederick was against Spicer's penal interest. The statement was not self-serving, did not minimize Spicer's role in the crimes, and did not shift blame. (See, e.g., *People v. Samuels* (2005) 36 Cal.4th 96, 120–121 [declarant's statement that defendant paid him to kill victim admissible because it was not exculpatory, self-serving or collateral]; *People v. Cortez* (2016) 63 Cal.4th 101, 128 [declarant's statement did not suggest he was trying to improve his situation with police].) Rather, the statement incriminated Frederick *and* Spicer. (See, e.g., *People v. Greenberger* (1997) 58 Cal.App.4th 298, 335 [statement inculpating declarant as shooter *and* defendant as driver admissible].)

Nor was the statement collateral. Instead, it was inextricably tied to the rest of Spicer's statement. That is, Spicer had given some bare details of the crime: he admitted being involved in a "hot one" (a murder) and the "get down"; he got rid of the gun; and he was hanging out of the window, apparently with his hoodie on. Although it was reasonable to infer from this that Spicer was the shooter, the extent of his involvement and level of criminal culpability were not certain. Spicer's statement that Frederick was with him increased Spicer's level of criminal culpability because Frederick was also a Bounty Hunter gang member and the murder victim was a rival gang member. Therefore, although Spicer might not have been intimately familiar with the intricacies of the gang enhancement statute and

that his admission increased the chances of its applicability, it is reasonable to infer that Spicer would have understood that committing a gang-related crime with a fellow gang member might lead to more adverse consequences and punishment. (See *Grimes*, *supra*, 1 Cal.5th at p. 718 [declarant's unfamiliarity with intricacies of death penalty law did not negate inference he understood committing murder on his own would be punished more severely than playing lesser role in murder]; see also *id.* at p. 717 [statements don't have to significantly enhance personal liability to be admissible].) Spicer's admission that he committed the crimes with a fellow gang member was therefore against his penal interests.

For these reasons, *People v. Gallardo* (2017) 18 Cal.App.5th 52, cited by Frederick, is distinguishable. The court in that case found the declarant's statement unreliable because he had made conflicting statements about his involvement in the crimes, he had repeatedly tried to mitigate his own blameworthiness, and the undercover informants asked leading or narrative questions in which they prompted specific answers. (*Id.* at pp. 74–75.) In contrast, there was no conflict in Spicer's story, he did not try to mitigate his blameworthiness, and the informant did not exert any untoward pressure on Spicer to get him to name Frederick or suggest to Spicer that Frederick was involved.

Frederick, however, argues that even if the statement was against Spicer's penal interests, the statement was unreliable. We do not agree. Although Spicer wasn't speaking in the comfort of his home to a close friend, Spicer did not know he was speaking to a confidential informant. As far as he knew, he was talking to an older, experienced fellow gang member whom he had no reason to distrust. Frederick also suggests that Spicer

18

implicated him because Spicer wanted to exculpate his other cousin, Mock. It is unclear why Spicer would want to incriminate one family member over another but, in any event, Spicer had no motive to lie to a person he would have perceived to be a friendly fellow inmate. If Spicer wanted to exculpate Mock, he could have done so without incriminating Frederick. Spicer's statement therefore had sufficient indicia of reliability to satisfy the exception's second prong. The trial court did not abuse its discretion in admitting the evidence.

For the same reasons, we reject Frederick's argument that the trial court abused its discretion by not excluding the statement under Evidence Code section 352. Spicer's statements were highly probative, and the resulting prejudice was simply that the statements were damaging. However, prejudicial in this context is not synonymous with damaging. (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

### 2. *Bruton*

Frederick also contends that admitting Spicer's statement violated Frederick's Sixth Amendment right to confront witnesses under *Bruton v. United States* (1968) 391 U.S. 123, 127. Broadly stated, *Bruton* applies when a facially incriminating statement of a nontestifying codefendant is introduced at their joint trial. (See generally *People v. Gallardo*, *supra*, 18 Cal.App.5th at p. 68.) However, *Bruton* applies only to testimonial hearsay statements. (*People v. Cortez*, *supra*, 63 Cal.4th at p. 129.) Spicer's statements to the confidential informant were not testimonial. (*Davis v. Washington* (2006) 547 U.S. 813, 825 [statements unwittingly made to government informant not testimonial]; accord, *People v. Fayed*, *supra*, 9 Cal.5th at p. 169.) Therefore, as Frederick acknowledges, *Cortez* forecloses his claim.

19

II. Admission of Isaiah's identification of Spicer

Spicer contends that the trial court prejudicially erred in admitting evidence that Isaiah identified him as the shooter. Spicer thus appears to argue that Quennisha's testimony about the Instagram profile page, Detective McCoy's testimony about his conversation with Quennisha, and all of Isaiah's statements to the detective about the shooting should have been excluded because they culminated in a suggestive identification procedure.

As an initial response to this, while Spicer objected to the Instagram photo, he concedes he did not object to the other evidence and that any issue as to that evidence has not been preserved for appellate review. But because Spicer also argues that his counsel's failure to object to the evidence constituted ineffective assistance of counsel, he urges us to analyze the matter in that context. To establish ineffective assistance of counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and that counsel's deficient performance resulted in prejudice, that is, there is a reasonable probability that but for counsel's failings defendant would have achieved a more favorable result. (*People v. Bell* (2019) 7 Cal.5th 70, 125; *Strickland v. Washington* (1984) 466 U.S. 668, 687–688.)

Spicer fails on the first prong because his counsel did not err by failing to object to the identification evidence. Spicer's specific claim of error appears to be that "the identification procedure" was unduly suggestive, and Isaiah's identification of Spicer as the shooter was unreliable. To "determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so,

20

(2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.)

What Spicer means by "identification procedure" is unclear. Spicer seems to lump all identification evidence—e.g., the Instagram photograph and Quennisha's and Isaiah's statements that "Jesse" was the shooter—under the misnomer of "identification procedure." But the only identification procedure instigated by law enforcement was the photographic six-pack Detective McCoy showed to Isaiah. The Instagram photograph and Isaiah's and Quennisha's statements to the detective were what led the detective to include Spicer's photograph in the six-pack. It is therefore unclear under what theory the Instagram photograph and the witnesses' statements about it should have been excluded.

As for the photographic six-pack, Spicer suggests it was unduly suggestive because it amounted to a single person show-up. That is, Isaiah had already identified Spicer from the Instagram photo, so of course Spicer stood out in the photographic six-pack. But, as we have said, what led the police to include Spicer in that six-pack was evidence—including Isaiah's own statements—that Spicer was involved in Denzel's murder. It is wholly unclear how evidence *Isaiah provided* to the police that Spicer was the shooter unduly suggested *to Isaiah* to

21

select Spicer or tainted the six-pack. (Cf., *People v. Slutts* (1968) 259 Cal.App.2d 886, 889–891 [drawing beard on defendant's photograph improperly suggestive].)  Analogizing the six-pack here to a single person show-up is inapt, and the identification evidence did not render the photographic six-pack unduly suggestive.  Rather, the jury was able to evaluate how Spicer ended up in the photographic six-pack and could have, but apparently did not, discount that evidence.

III.   Admission of evidence Spicer was on probation

Spicer contends that references made during the Perkins operation that he was on probation violated his right to a fair trial.  We disagree.

A. *Additional background*

Before trial, Spicer's counsel objected to any references made during the Perkins operation about Spicer being on probation.  The prosecutor argued that the references provided context, showing how the confidential informant built rapport with Spicer, and that Spicer was not interrogated.  The trial court said it would not allow Spicer's "juvenile probation to come into play" but also would not require the People to "take out this word and that word."  "I think in the big picture he was in fact on probation in some way.  I'm not going to allow the People to get into the details of what he was on probation for as a juvenile or what that juvenile sustained petition was about. . . .  [¶]  But when I'm looking at this and trying to do . . . [a] 352 analysis, I think the probative value of the transcript, the statements in [their] entirety greatly outweigh[ ] any prejudicial effect."

The Perkins operation was played for the jury, and during it, the confidential informant first raised the notion of probation.

After Detective McCoy came into the cell and said he would return in a few minutes to talk about Poppy getting killed, the confidential informant observed that Spicer was there for "no probation violation." When Spicer said the police had no evidence, the confidential informant said, "You never know," because people talk. Spicer replied, "Man shit. I aint going out like that. Shit. About to get violated though." When the confidential informant asked, "What, on a hot one?" Spicer said, "Hell yeah."

Later, after the two men discussed details of the murder, the confidential informant told Spicer he "wouldn't even give a fuck about a violation," that Spicer should take a violation and "run with it," and Spicer should tell the police he had weed in his backpack and somebody snatched it—"You just got to use your head, but you have to take a violation or a case." Spicer replied, "Violation," and the confidential informant agreed that he too "would take a violation. But you—you on juvenile probation" and, "Fuck that. You on—you now on probation. Just say you catch a violation." The confidential informant then explained that by the time Spicer got processed on a violation he could be released, and then "you're off the juvenile shit." The confidential informant exhorted that it was better to deal with probation, to "run along with that probation violation shit, and be happy."

B. *The trial court did not abuse its discretion.*

Only relevant evidence is admissible. (Evid. Code, § 350.) Relevant evidence is "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210.) Generally, evidence of prior criminal acts is inadmissible to show

23

a defendant's disposition to commit such acts. (*Id.*, § 1101, subd. (a).) However, evidence that a person committed an uncharged crime may be admitted to prove something other than the defendant's character, such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, as well as to attack or support the credibility of a witness. (*Id.*, § 1101, subds. (b), (c).) Evidence that a defendant was on probation or parole may have probative value, and the trial court can take measures to reduce the risk of undue prejudice from admitting such evidence. (*People v. Fuiava* (2012) 53 Cal.4th 622, 667–668 [defendant's prior convictions and parole status admissible to establish that motive for shooting at officers was to avoid arrest].)

Although admitting evidence of a defendant's prior criminality could prejudice the defendant's case and render suspect the outcome of the trial, whether to admit such evidence rests in the trial court's sound discretion. (*People v. Harris* (1994) 22 Cal.App.4th 1575, 1580–1581; see, e.g., *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314.)

Here, the People argue the evidence was not admitted under Evidence Code section 1101; instead, the evidence was admitted to give context to Spicer's statements and to show they were voluntarily made. While that was certainly the basis for the People's *argument* why references to probation should not have been redacted, it did not eliminate the *danger* that references to probation could suggest Spicer had committed a prior crime. Notwithstanding that danger, the trial court acted within its discretion in admitting the references to probation. Reviewing the Perkins operation as a whole, it is clear why the trial court did not agree that all references to probation should be redacted.

24

As the People argued, the references did give context to the Perkins operation and to Spicer's statements. The confidential informant continually referred to probation in the context of advising Spicer to take a probation violation. Specifically, the confidential informant told Spicer to say he had been selling weed and somebody took his backpack containing the weed, apparently to explain how the backpack ended up in the car. The confidential informant thus was building rapport with Spicer and suggesting what Spicer could do to limit his criminal liability.

Even if the trial court erred in admitting references to Spicer's probationary status, any error was harmless because it is not reasonably probable a result more favorable to him would have resulted in the absence of any error. (*People v. Mullens* (2004) 119 Cal.App.4th 648, 652, 659 [admission of evidence prohibited by Evid. Code, §§ 352, 1101 reviewed under harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 835–836].) Isaiah thought the shooter looked like a boy he knew named Jesse. When shown a photograph of Spicer from Instagram and the photographic six-pack, Isaiah said he was the shooter. Independent of all this, items belonging to Spicer—including his identification—were in the car used in Denzel's murder and the attempted murder of Neal. Spicer's fingerprints were in that car. And the references to probation were hardly the most damning things said during the Perkins operation. Spicer admitted he was involved in Denzel's murder and that he personally got rid of the gun. Spicer also confirmed details about the crimes a participant would know: the shooting was committed during the daytime, and the gun used was a Glock, which aligned with forensic analysis of cartridges found at the

crime scenes. We therefore cannot find that references to Spicer being on probation prejudiced him.

For the same reasons, admitting the evidence did not render Spicer's trial fundamentally unfair. (See generally *Estelle v. McGuire* (1991) 502 U.S. 62, 70; *People v. Partida* (2005) 37 Cal.4th 428, 439 [even incorrect evidentiary ruling denies a defendant due process of law only if it makes trial fundamentally unfair].)

IV.     Sufficiency of the evidence

Both defendants contend that the evidence was insufficient to support the jury's verdicts. We disagree.

This contention requires us to " 'review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation]. We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation]. If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

Under this standard of review, we now explain why the evidence was sufficient to support Spicer's and Frederick's convictions.

A. *Spicer*

Spicer was convicted of murder, attempted murder, and shooting from an occupied vehicle.  Murder is the unlawful killing of a person with malice aforethought.  (§ 187, subd. (a).)  Attempted murder "requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing."[17]  (*People v. Lee* (2003) 31 Cal.4th 613, 623.)  Finally, any "person who willfully and maliciously discharges a firearm from a motor vehicle at another person other than an occupant of a motor vehicle is guilty of a felony."  (§ 26100, subd. (c).)

The evidence was more than sufficient to support Spicer's convictions of these crimes.  Isaiah identified Spicer as the shooter, saying he recognized Spicer because Spicer had dated a girl, Raja, from the projects.  Instagram messages confirmed Spicer had dated Raja, lending credibility to Isaiah's identification.  Spicer made incriminating statements to the confidential informant that he was involved in a "hot one" and provided accurate details about the crime, i.e., the murder occurred during the daytime and the gun used was a Glock.  Spicer said he got rid of the gun; in fact, the police never recovered the gun.  Spicer's fingerprints and items with his name on them (including his school identification) were in the car used to commit the crimes.  A cell phone linked to Spicer was in the area the crimes were committed around the time they were committed.  When Spicer was arrested, he had a new cell phone with a different number than the one he had, and he had

---

[17] Spicer does not address the sufficiency of the evidence to support the premeditation finding.

27

terminated the account associated with his old cell phone, which shows he was trying to get rid of anything tying him to the crimes.

Spicer, however, points out that at trial Isaiah recanted his prior identifications and statements, saying he did not remember telling the detective anything. However, a witness's out-of-court identification that the witness later recants at trial may still support a conviction. (*People v. Cuevas* (1995) 12 Cal.4th 252, 275–277.) And there was an explanation for Isaiah's failure to remember any of his prior statements to the detective: the Gordon family, including Isaiah and Denzel, were gang members. The gang expert testified that crime victims who are gang members often will not snitch because it could put their families in danger. (See, e.g., *id.* at p. 268 [fear or intimidation may explain witness's recantation of prior statement].)

Spicer points to other supposed weaknesses in the evidence. Isaiah said his back was to the shooter, the shooter "kind of" looked like a boy named Jesse, Isaiah couldn't really see the shooter's face, he only caught a glimpse of the shooter's face, and both Isaiah and Quennisha were guarded about who first showed them Spicer's Instagram photograph. And, although Spicer's fingerprints and backpack were in the car, it is impossible to tell when they were put there. However, on appeal, we may not reweigh evidence; instead, it was the trier of fact's job to evaluate and weigh it. (See generally *People v. Covarrubias, supra,* 1 Cal.5th at p. 890; *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 67–68 [jury may weave cloth of truth from evidence].)

Although Spicer also argues that there was insufficient evidence to support his conviction for the crimes as an aider and abettor, he was not prosecuted as such. Rather, the prosecution's

theory was Spicer was the shooter, and the jury found personal gun use allegations true as to him and principal gun use allegations true as to Frederick. Spicer's conviction therefore was not based on an aider and abettor theory of liability, but even if it were, the above-cited evidence would be more than sufficient evidence of it as well.

B. *Frederick*

The prosecution's theory as to Frederick was that he drove the car, and so he was prosecuted as an aider and abettor. A person aids and abets the commission of a crime when the person, acting with (1) knowledge of the perpetrator's unlawful purpose, and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages, or instigates, commission of the crime. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054.) Factors relevant to aiding and abetting are presence at the scene of the crime, companionship, and conduct before and after the offense. (*Ibid.*)

The key piece of evidence that Frederick aided and abetted these crimes came from Spicer, and, as we have said, Spicer's statements were admissible against Frederick. When the informant asked the name of Spicer's cousin that "went with you," Spicer responded, "Red" and "Akkeli." Red is Frederick's moniker. Such testimony of a single witness may be sufficient to support a conviction unless that testimony is physically impossible or inherently improbable. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) The remaining evidence against Frederick might not have been sufficient by itself to show he was with Spicer, but when combined with Spicer's statement it buttressed that conclusion. Frederick's prints were in the stolen car used to

commit the crimes, and so were Spicer's prints. Frederick's cell phone was in the general area of the crime scenes when the crimes were committed, and so was Spicer's cell phone. Frederick was a Bounty Hunter gang member, and so was Spicer.

That Frederick's prints were not found in the driver's area and that it cannot be ascertained when his prints were left in the car were matters for the jury to consider in evaluating the evidence. (See generally *People v. Covarrubias, supra,* 1 Cal.5th at p. 890.) Similarly, it was the jury's task to evaluate the strength of evidence that the cell phone that was in the general area of the crimes when they were committed belonged to Frederick. Also, even though Isaiah could not tell how many people were in the car, the jury could reasonably infer it was just two because Spicer identified only Frederick as being in the car with him that day.

The evidence being sufficient that Frederick was present during the commission of the crimes, it was also sufficient to establish the elements of aiding and abetting. Frederick and Spicer were members of the same gang. Their gang membership, coupled with the gang expert's testimony, showed that they were putting in work, i.e., committing crimes for their gang; hence, Frederick knew of Spicer's unlawful purpose. As the driver, Frederick facilitated and promoted that unlawful purpose. Frederick not only drove Spicer into rival gang territory, but the video shows the car slowing down as Spicer hangs out the window to shoot at Denzel and Isaiah. Frederick therefore maneuvered the car in a manner so that Spicer could shoot from the window. (See, e.g., *In re Jose D.* (1990) 219 Cal.App.3d 582, 585 [defendant aided and abetted crime by maneuvering car so accomplice could shoot victim].)

Also, in one of his statements, Isaiah said the *driver* called out, "Bounty Hunters." Calling out his gang's name just before Spicer shot Denzel evidences Frederick's intent to aid the crime. Frederick then drove Spicer several miles away, to where Neal was parked, so that Spicer could again shoot at someone. That two crimes were committed just miles and about 30 minutes apart from each other severely undercuts the notion that Frederick was merely dozing in the car's back seat or busy smoking dope, as he suggests. Instead, the evidence shows that Frederick actively aided and abetted his cousin and fellow gang member to commit the crimes.

V.     Late discovery

Spicer contends that the video—not the audio—of the Perkins operation should have been excluded because the video was not produced until after trial commenced or, alternatively, the trial court should have instructed the jury with CALCRIM No. 306[18] on late discovery. We disagree.

A. *Additional background*

Spicer's defense counsel objected under section 1054 to the video of the Perkins operation because she had not been told of its existence until after trial began and it had not been turned

---

[18] The instruction states that parties must disclose their evidence to the other side before trial within the time limits set by law, and failure to do so may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial. The instruction goes on to state that an attorney failed to timely disclose evidence, so in "evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure." (CALCRIM No. 306.)

over until the end of the first day of witness testimony. The prosecutor represented that she learned about the video's existence the Friday before starting trial, immediately let defense counsel know about the video, and turned it over a week later, on receiving it herself. She further explained that Detective McCoy had not known about the video either.

The trial court overruled the objection, saying it would not preclude the People from playing the video although it might consider other sanctions. The video was played for the jury.

Thereafter, defense counsel asked that the video not be admitted into evidence and that the trial court instruct the jury with CALCRIM No. 306. The trial court found that the defense was not disadvantaged by the late discovery and declined to give CALCRIM No. 306.

B. *No discovery violation occurred.*

Before trial, the prosecution must disclose to the defense categories of evidence in the prosecution's possession or known to be in the possession of investigating agencies. (§ 1054.1.) Evidence that must be disclosed includes a defendant's statements and all "relevant real evidence" obtained as part of the investigation. (*Id.*, subds. (b), (c).) If the prosecution fails to comply with its discovery obligations, a trial court may make any order necessary to enforce the discovery statutes, including informing the jury of any untimely disclosure. (*People v. Verdugo* (2010) 50 Cal.4th 263, 279–280.) Disclosures shall be made at least 30 days prior to trial, unless good cause is shown why a disclosure should be denied, restricted, or deferred. (§ 1054.7.) "If the material and information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately, unless good cause is shown why a

32

disclosure should be denied, restricted, or deferred." (*Ibid.*) We review a trial court's ruling on whether to impose a discovery sanction for abuse of discretion. (*People v. Ayala* (2000) 23 Cal.4th 225, 299.)

The trial court did not abuse its discretion either by refusing to exclude the video or to give CALCRIM No. 306. First, the prosecutor and the investigating officer did not know the video existed until just before trial. Immediately on receiving it, the prosecutor gave it to the defense. On appeal, Spicer incorrectly interprets statements the prosecutor made as stating she turned it over one week *after* getting it, but that interpretation is incorrect, and nobody below, including defense counsel, interpreted her comments that way. Thus, the prosecutor complied with section 1054.7, because she told defense counsel about the video when she discovered its existence and turned it over to them as soon as she got it. (See *People v. Verdugo, supra,* 50 Cal.4th at p. 287 [prosecutor produced notes when he learned about them during trial; no discovery violation found].)

Second, to prevail on a claim alleging a violation of discovery statutes, the appellant must show a reasonable probability the result of the proceedings would have been different had the evidence been timely disclosed. (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 467.) Spicer argues that the late disclosure prevented him from developing a defense. However, it is unclear why that would be so. The defense had the audio of the Perkins operation long before trial. A crucial difference between the audio and the video was the latter showed Spicer pulling his hoodie over his head, suggesting he covered his face when he shot Denzel. Yet, the prosecutor represented that

33

when the audio was turned over, a "supplemental" (which likely is a reference to a report) containing the detective's observation that Spicer pulled up his hood was also turned over.  Therefore, even before it received the video, the defense knew that Spicer had covered his head.  (Cf. *People v. Filson* (1994) 22 Cal.App.4th 1841, 1848–1852 [failure to disclose defendant's recorded statement reversible error because relevant to defense he was too intoxicated to form specific intent necessary to commit the crime], disapproved on another ground by *People v. Martinez* (1995) 11 Cal.4th 434, 452.)

Finally Spicer cites *Brady v. Maryland* (1963) 373 U.S. 83, which requires the prosecution to disclose to the defense all *exculpatory*, material evidence known to the prosecution team. The video was not exculpatory; it was incriminating.  Further, the prosecutor did disclose the video, albeit not within 30 days of trial.  Accordingly, no *Brady* violation occurred.  (See, e.g., *People v. Verdugo*, *supra*, 50 Cal.4th at p. 287 [no *Brady* error where evidence not favorable to defense and was disclosed at trial].)

VI.    Assembly Bill No. 333[19]

As we have said, the jury found gang allegations true against both defendants as to all counts.  However, Assembly Bill No. 333, which took effect on January 1, 2022, made significant amendments to the gang statute, section 186.22.  The legislation redefined "pattern of criminal gang activity" in five respects. (1)  Previously, the predicate offenses had to have been committed, or convictions had to have occurred, within three years of each other.  Now, additionally, the last offense must have

---

[19] The parties submitted supplemental letter briefs on Assembly Bill No. 333 and other recently-enacted laws.

occurred within three years of the date the current offense is alleged to have been committed.  (§ 186.22, subd. (e)(1).)  (2)  The amended law now states that the predicate crimes must have been committed by "members," not simply "persons," as the law had formerly stated.  (*Ibid.*)  (3)  The amendments impose a new requirement that the predicate offenses "commonly benefited a criminal street gang, and the common benefit of the offense is more than reputational[.]"  (*Ibid.*)  (4)  Looting, felony vandalism, felony theft of an access card or account, and other identity fraud crimes no longer qualify as predicates, while other offenses (kidnapping, mayhem, torture, and felony extortion) now do so qualify.  (*Ibid.*)  (5)  The currently charged offense may not be used to establish the pattern of criminal gang activity.  (*Id.* at subd. (e)(2); see *People v. Lopez* (2021) 73 Cal.App.5th 327, 345 (*Lopez*).)

Assembly Bill No. 333 also modified the definition of "criminal street gang."  Previously, section 186.22 stated that a criminal street gang was "any ongoing organization, association, or group" of three or more persons, whether formal or informal. That language has been changed to "an *ongoing organized association* or group of three or more persons, whether formal or informal."  (§ 186.22, subd. (f), italics added.)  The previous definition required that the gang's "members *individually* or collectively engage in, or have engaged in," the pattern of criminal gang activity.  (Former § 186.22, subd. (f), italics added.) Now, the word "individually" has been excised and the gang's members must "collectively" engage in, or have engaged in, the pattern of criminal gang activity.  (§ 186.22, subd. (f).)  The amendment also added a new subdivision that clarifies what it means to benefit the gang:  "As used in this chapter, to benefit,

promote, further or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational.  Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)

Defendants argue that they are entitled to the ameliorative benefits of the amendments to section 186.22, and the People agree.  Courts of Appeal that have considered the issue have concluded that Assembly Bill No. 333's amendments to section 186.22 apply retroactively where, as here, defendants' convictions were not final before the amendments took effect.  (See, e.g., *Lopez, supra,* 73 Cal.App.5th at pp. 343–344; *People v. E.H.* (2022) 75 Cal.App.5th 467, 478; *People v. Sek* (2022) 74 Cal.App.5th 657, 667; *People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1032; see generally *In re Estrada* (1965) 63 Cal.2d 740, 745 [absent contrary evidence, an amendment reducing punishment applies retroactively to nonfinal judgments].)

Under this authority, Assembly Bill No. 333 retroactively applies to Spicer's and Frederick's case, which was not final when the amendments took effect.  And, as the People further concede, the evidence did not establish the new statutory requirements of section 186.22.  There was no evidence, for example, that the two predicate offenses introduced at trial benefited a criminal street gang in a way that was more than reputational.  (§ 186.22, subd. (e)(1).)  Indeed, the jury was instructed, in accordance with the law in effect at the time, that the predicate offenses did not have to be gang-related.  Given this evidentiary deficit, the true findings on the gang enhancements and the gang-related gun use

enhancements as to Frederick[20] must be reversed and the matter remanded to allow the prosecution the option of retrying the enhancements and establishing all elements required by Assembly Bill No. 333.[21]

Defendants, however, also argue that section 1109, which was added by Assembly Bill No. 333, applies. Section 1109, subdivision (a), provides, inter alia, that if requested by the defense, a charged section 186.22, subdivision (b) or (d) enhancement "shall be tried in separate phases," with the question of guilt of the underlying offense to be determined first and the truth of the gang enhancement tried thereafter. The People's concession regarding retroactivity does not extend to section 1109, and we need not decide whether it is retroactive because remand will give defendants an opportunity to try the gang allegations separately. (See generally *People v. Perez* (2022) __ Cal.App.5th __, __ [2022 WL 1302282] [section 1109 is not retroactive]; but see *People v. Burgos* (2022) 77 Cal.App.5th 550 [section 1109 is retroactive].) But to the extent defendants contend that admission of the gang evidence nonetheless rendered their trial fundamentally unfair, we reject that contention. It is not reasonably probable that defendants were prejudiced by any failure to bifurcate the gang allegations. (See,

---

[20] As we have said, the jury found true gun use enhancements as to Frederick under section 12022.53, subdivision (e)(1), which applies to any principal in the commission of an offense if "(A) The person violated subdivision (b) of Section 186.22. (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d)."

[21] As remand for a potential retrial of the gang enhancements is required, we need not decide whether any of the other new elements of section 186.22 were met.

e.g., *People v. E.H.*, *supra*, 75 Cal.App.5th at p. 480.)  The gang evidence was inextricably tied to and relevant to prove the underlying charges, and in particular, motive and intent.  (See generally *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049–1050 [gang evidence often relevant to charged offense].)

VII.   Additional ameliorative recently-enacted laws

Defendants may be entitled to the benefits of other recently-enacted ameliorative laws:  Assembly Bill No. 518, Senate Bill No. 567, and Assembly Bill No. 124.

When defendants were sentenced, section 654 provided that a criminal act punishable in different ways by different provisions of law must be punished under the provision providing the *longest* potential term of imprisonment.  Our legislature has since passed Assembly Bill No. 518 (Stats.2021, ch. 441), effective January 1, 2022.  It amended section 654, and, as amended, the section now provides that an act or omission punishable in different ways by two different provisions of law, as in this case, may be punished under *either* provision.  Hence, the longest term of imprisonment is no longer mandatory.

Also effective January 1, 2022 are amendments to section 1170 made by Senate Bill No. 567 (2021–2022 Reg. Sess.) (Stats.2021, ch. 731) and Assembly Bill No. 124 (2021–2022 Reg. Sess.) (Stats.2021, ch. 695).  As relevant here, section 1170, subdivision (b), now makes the middle term the presumptive sentence unless certain circumstances exist.  And where the defendant was a youth, meaning under the age of 26, the low term shall be imposed unless the trial court finds that aggravating circumstances outweigh mitigating ones such that imposing the low term would be contrary to the interests of justice.  (§ 1170, subd. (b)(6).)

The People concede that these changes in law also are retroactive and that they potentially confer ameliorative benefits to Spicer and/or Frederick.[22]  For the reasons we have discussed in regard to the retroactivity of Assembly Bill No. 333, we agree with the parties that the amendments made by Assembly Bill Nos. 124 and 518 and Senate Bill No. 567 also apply retroactively.  (See generally *People v. Sek*, *supra*, 74 Cal.App.5th at p. 673 [Assembly Bill No. 518 is retroactive]; *People v. Flores* (2022) 73 Cal.App.5th 1032, 1038–1039 [Senate Bill No. 567 is retroactive].)

Because we are remanding for a possible retrial of the gang enhancements and a full resentencing (see, e.g., *People v. Buycks* (2018) 5 Cal.5th 857, 893), the trial court shall resentence appellants in accordance with Assembly Bill Nos. 124 and 518 and Senate Bill No. 567 should they be relevant to any potential sentence on remand.

VIII.  Spicer's custody credits.

Spicer was arrested on April 23, 2019 and originally sentenced on November 2, 2020.  The trial court awarded him 551 days of actual custody credits but, as the People concede, he was entitled to 560 days.

## DISPOSITION

The true findings on the gang allegations are reversed as to Spicer and Frederick, the true findings on the principal gun use allegations are reversed as to Frederick, and Spicer's and Frederick's sentences are vacated.  The matter is remanded with

---

[22] Frederick was over the age of 26 when he committed the crimes and therefore is not entitled to any benefit under newly-enacted section 1170, subdivision (b)(6).

39

the direction to the trial court to provide the People an opportunity to retry the section 186.22, subdivision (b), gang allegations under the law as amended by Assembly Bill No. 333. At the conclusion of any retrial on the gang allegations or on remand if the People elect not to retry the gang allegations, the trial court shall resentence Spicer and Frederick and consider the potential applicability of Assembly Bill Nos. 124 and 518 and Senate Bill No. 567.  Any new abstract of judgment should reflect that Spicer has 560 actual days of custody credit, and any new abstract of judgment shall be forwarded to the Department of Corrections and Rehabilitation.  In all other respects, the judgments are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

EGERTON, J.

KIM, J.*

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.